IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DELBERT CHRISTOPHER,

        Plaintiff,                 No. 2:09-cv-3584 KJN[1] P

    vs.

DEPUTY VANG,

        Defendant.            <u>ORDER</u>

_____/

I. <u>Introduction</u>

        Plaintiff Delbert Christopher is a state prisoner incarcerated at the California Substance Abuse Treatment Facility and State Prison, in Corcoran, California.  Plaintiff proceeds in forma pauperis and with appointed counsel in this civil rights action filed pursuant to 42 U.S.C. § 1983.   This action proceeds on plaintiff's original complaint (Dkt. No. 1), filed on December 28, 2009, against one defendant, Vong Vang, a Correctional Deputy with the Butte County Sheriff's Office.  Plaintiff contends that, on April 2, 2008, defendant used excessive force against plaintiff, resulting in physical and emotional injuries.

---

[1] Pursuant to the consent of both parties, this action proceeds pursuant to the authority of the magistrate judge for all purposes.  <u>See</u> 28 U.S.C. § 636(c); Local Rule 305(a).  (<u>See</u> Dkt. Nos. 23, 24.)

1         Presently pending is defendant's motion for summary judgment.  (Dkt. No. 54.)

2  Plaintiff filed an opposition (Dkt. No. 55), and defendant filed a reply (Dkt. No. 56).  For the

3  reasons that follow, the court denies defendant's motion for summary judgment.

4  II.  Legal Standards

5     A.  Summary Judgment

6         Summary judgment, in whole or in part (summary adjudication of issues), is

7  appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil Procedure

8  56(c) is met.  "The judgment sought should be rendered  if . . . there is no genuine issue as to any

9  material fact, and . . . the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

10  56(c).

11             Under summary judgment practice, the moving party always bears
              the initial responsibility of informing the district court of the basis

12             for its motion, and identifying those portions of "the pleadings,
              depositions, answers to interrogatories, and admissions on file,

13             together with the affidavits, if any," which it believes demonstrate
              the absence of a genuine issue of material fact.

14

15  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), quoting Federal Rule of Civil Procedure

16  56(c).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue,

17  a summary judgment motion may properly be made in reliance solely on the 'pleadings,

18  depositions, answers to interrogatories, and admissions on file.'"  Id.  Summary judgment should

19  be entered, after adequate time for discovery and upon motion, against a party who fails to make

20  a showing sufficient to establish the existence of an element essential to that party's case, and on

21  which that party will bear the burden of proof at trial.  Id. at 322.  "[A] complete failure of proof

22  concerning an essential element of the nonmoving party's case necessarily renders all other facts

23  immaterial."  Id. at 323.  In such a circumstance, summary judgment should be granted, "so long

24  as whatever is before the district court demonstrates that the standard for entry of summary

25  judgment, as set forth in Rule 56(c), is satisfied."  Id.

26  ////

1    If the moving party meets its initial responsibility, the burden then shifts to the

2  opposing party to establish that a genuine issue as to any material fact actually exists.  See

3  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting

4  to establish the existence of a factual dispute, the opposing party may not rely upon the

5  allegations or denials of its pleadings but is required to tender evidence of specific facts in the

6  form of affidavits, and/or admissible discovery material, in support of its contention that a

7  dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

8  must demonstrate that the disputed fact is material, i.e., a fact that might affect the outcome of

9  the suit under governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);

10  T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and

11  that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict

12  for the nonmoving party, see Anderson, 477 U.S. at 248; T.W. Elec. Serv., 809 F.2d at 631.

13    In the endeavor to establish the existence of such a factual dispute, the opposing

14  party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

15  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

16  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary

17  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

18  genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e), Advisory

19  Committee's note on 1963 amendments).

20    In resolving a summary judgment motion, the court examines the pleadings,

21  depositions, answers to interrogatories, and admissions on file, together with any affidavits.  Fed.

22  R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  Anderson, 477 U.S. at

23  255.  All reasonable inferences that may be drawn from the facts placed before the court must be

24  drawn in favor of the opposing party.  Matsushita, 475 U.S. at 587.  Nevertheless, inferences are

25  not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate

26  from which the inference reasonably may be drawn.  Richards v. Nielsen Freight Lines, 602 F.

1   Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

2   demonstrate a genuine issue, the opposing party "must do more than simply show that there is

3   some metaphysical doubt as to the material facts . . .  Where the record taken as a whole could

4   not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

5   trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

6       B.  Excessive Force

7           Plaintiff's status as a pretrial detainee during the events underlying this action

8   require that his excessive force claim be analyzed pursuant to the Fourteenth Amendment's Due

9   Process Clause.  A pretrial detainee is not protected by the Eighth Amendment's proscription

10  against cruel and unusual punishment because he has not been convicted of a crime.  See Bell v.

11  Wolfish, 441 U.S. 520, 535 n.16 (1979); Ingraham v. Wright, 430 U.S. 651, 671-72 n.40 (1977);

12  Lee v. City of Los Angeles, 250 F.3d 668, 686 (9th Cir. 2001). Nevertheless, the Due Process

13  Clause protects pretrial detainees from the use of excessive force.  Bell, 441 U.S. at 535-36; see

14  Redman v. County of San Diego, 942 F.2d 1435, 1440 (9th Cir. 1991) (en banc) (quoting

15  Graham v. Connor, 490 U.S. 386, 395 n.10 (1989)).  Moreover, the protections of the Due

16  Process Clause are at least as great as those of the Eighth Amendment.  See City of Revere v.

17  Massachusetts General Hospital, 463 U.S. 239, 244 (1983); Gary H. v. Hegstrom, 831 F.2d 1430,

18  1432 (9th Cir. 1987).

19          To determine whether the alleged use of force was excessive, this court must

20  assess the following factors:  "(1) the need for the application of force, (2) the relationship

21  between the need and amount of force that was used, (3) the extent of the injury inflicted, and (4)

22  whether force was applied in a good faith effort to maintain and restore discipline."  White v.

23  Roper, 901 F.2d 1501, 1507 (9th Cir. 1990).  In the context of a facility disturbance, "the

24  question of whether the measure taken inflicted unnecessary and wanton pain and suffering

25  ultimately turns on 'whether force was applied in a good faith effort to maintain or restore

26  discipline or maliciously and sadistically for the very purpose of causing harm.'"  Hudson v.

4

1  McMillian, 503 U.S. 1, 6 (1992) (quoting Whitley v. Albers, 475 U.S. 312, 320-21 (1986).)

2  III.  Undisputed Facts

3           1.  Plaintiff was born on September 2, 1962, and is presently 50 years of age.

4           2.  At age 17, plaintiff was involved in a motorcycle accident that resulted in

5  injuries to his brain and right foot.  Plaintiff has residual brain damage, and uses a walker and/or

6  wheelchair.

7           3.  On March 8, 2008, plaintiff was arrested at Oroville Hospital, taken into

8  custody and detained at the Butte County Jail.

9           4.  On April 2, 2008, while plaintiff was still detained in the Butte County Jail, an

10  incident occurred between plaintiff and defendant Vang.  While the parties agree that the incident

11  took place at approximately 11:50 p.m., pursuant to Vang's response to a disruption in the "M

12  Pod" of the Butte County Jail, the parties dispute the other facts regarding this incident.

13           5.  Between April 4, 2008, and September 30, 2008, plaintiff was seen several

14  times by medical, forensic and social worker staff.

15  IV.  The April 2, 2008 Incident

16       A.  Plaintiff's Allegations

17           As set forth in his complaint, plaintiff alleges that the April 2, 2008 incident

18  began when "another inmate [was] doing unauthorized butt naked donkey kicks" in the "M-Pod"

19  of the Butte County Jail, where plaintiff was housed; that a disruption ensued, in which plaintiff

20  was not involved; that several officers, including defendant Vang, entered M-Pod and "instructed

21  all inmates to get on their beds and stay there until officers contained the situation at hand;" that

22  "[d]uring this time, ADA, wheelchair bound [plaintiff] was making his bed in an attempt to go to

23  sleep for the night;" that another officer ordered plaintiff to "have a seat on his bed until the

24  situation at hand was taken care of;" that, "[b]ecause [plaintiff] was already in his wheelchair he

25  insisted that he be allowed to finish making his bed . . . so that he could go to bed for the night."

26  (Complaint (Dkt. No. 1 at 3-4).)

1      Plaintiff alleges that thereafter (id. at 4):

2          Officer Vang then ordered Mr. Christopher to pack up his personal
           belongings because he was being placed in Administrative
3          Segregation.  Being that Mr. Christopher is physicaly disabled
           ADA.  He could not move very fast.  And did not move fast
4          enough to suitte Officer Vang. . . . Officer Vang proceeded to yank
           Mr. Christopher off his bed onto the floor.  Once on the floor
5          Officer Vang placed Mr. Christopher in a violent headlock.
           Officer Vang then proceeded to use that headlock that he had
6          aplied on Mr. Christopher to force him violently into his
           wheelchair.  Then Officer Vang proceeded to wheel Mr.
7          Christopher out of M-Pod.  On the way out of the Pod  Officer
           Vang and Mr. Christopher had a confrontation in which words
8          were exchanged between them.  Once  Officer Vang reached M-
           Pods door and out of camera site.  He proceeded to place Mr.
9          Christopher in another violent headlock.  Then proceeded to wheel
           Mr. Christopher out of M-Pod to Administrative Segregation.  Due
10         to have being forced to the ground by excessive force that was
           unnecessary.  Mr. Christopher suffered cronic back pain in which
11         he sufferes still today.  On a scale of 1 to 10 the pain being at a
           level 8.  Mr. Christopher also suffers from emotional distress,
12         paranoid psychosis and nightmares on a nightly basis.  Because of
           what Officer Vang did to him on April 2, 2008. . . . The range of
13         unnecessary force that  Officer Vang used by pulling Mr.
           Christopher off his bed.  Could have been life threating.  Because
14         Mr. Christopher could have hit his head killing him or breaking his
           neck.  Or causing worse brain damage than was already caused do
15         to a motorcycle accident when he was 18 years old. . . .

16         In support of his allegations, plaintiff has submitted excerpts from the deposition

17  transcript of inmate witness Keith Mullikin (Pltf. Exh. 6 (Dkt. No. 55-3 at 1-12)), which provides

18  in part (id. at 7-8, 11):

19         [T]he guards didn't give [plaintiff] barely any time to try and get
           up on his own.  They didn't help him up.  Officer Vang was
20         basically rushing him and like, you know, just pulling him off the
           ground as much as he could and then finally just, you know, just
21         tossed him into his wheelchair. . . .

22         [Plaintiff] was cursing because I think he was hurt.  When he hit
           the ground, I mean, it didn't look very well from where I was
23         sitting.  He was definitely angry.  Definitely mad and he was
           cursing.  He was complaining about his knee hurting and, yes, he
24         was being verbally abusive toward all the guards that were in the
           pod.

25
           I remember Mr. Vang wheeling Mr. Christopher out.  The door of
26         the pod was open.  Another CO was holding it open for him so he

1     could wheel him out and then as he reached the door, right as he
2     got through the door, Mr. Vang put him in the headlock and as I
     seen him as I seen him (sic) put him in the headlock, he was still
3     walking and he walked out of view and the door closed.  So I'd say
     four, five seconds that I actually seen it, the headlock on, you
4     know, and then he walked out of view.

5     B.  Defendant's Allegations

6            As set forth in his declaration, defendant Vang states only that "[i]n April of 2008,

7 I was employed as a correctional officer, through the Butte County Sheriff's Office, at the Butte

8 County Jail."  On April 2, 2008, at approximately 11:50 p.m., "I was working as the Delta Floor

9 officer," and "responded to a disruption in M pod," during which "an incident occurred between

10 myself and Delbert Christopher."  (Dkt. No. 54-7 at 1-2.)

11           Vang provided a more detailed account of the incident in his April 2, 2008 Butte

12 County Sheriff's Office "Incident Report."  (Pltf. Exh. 5 (Dkt. No. 55-2 at 15-8).)  The report

13 recounts the precipitating disruption in M-Pod, and states that, in response to plaintiff's verbal

14 abuse, defendant Vang "told Inmate Christopher to roll his belongings up."  (Id. at 17-8.)

15 Plaintiff instead reportedly sat down on his bunk, ignored defendant's repeated orders to roll up

16 his belongings, and continued to be verbally abusive.  Vang stated that thereafter (id. at 18):

17     Seeing that Inmate Christopher was ignoring my order, I attempted
     to assist Inmate Christopher into his wheel chair, which was within
18     two feet away from his bunk.  I grabbed a hold of Inmate
     Christopher's left arm and attempted to stand him up.  Due to the
19     difference in our body size and Inmate Christopher physically
     resisting by dropping his dead weight on the ground, I was unable
20     to place Inmate Christopher into his wheel chair.  Inmate
     Christopher fell to the floor while I held his upper body up by
21     maintaining the hold on his left arm.

22     Inmate Christopher continued to physically resist me as I ordered
     him multiple times to "get up" while attempting to help him off the
23     floor by pulling up his left arm.  I then placed Inmate Christopher's
     left arm into an (sic) rear wrist lock in an attempt to gain Inmate
24     Christopher's compliance.  CO Bryant also came to my location at
     that time and assisted me in placing Inmate Christopher into his
25     wheel chair while CO Koenig-Dent held the wheel chair in place.

26     I then took control of the wheel chair and began pushing Inmate

7

Christopher out of the pod while he continued to curse at me. Once we got to the yellow line, Inmate Christopher called me a "Fucking Chinaman." I stopped, placed my right arm over Inmate Christopher's right shoulder (for my safety) as I leaned forward to ask Inmate Christopher what he had just called me. Inmate Christopher continued to curse at me. I pushed Inmate Christopher out into a Delta interview room. I removed all the furniture from the interview room.

. . . While inside the interview room, Inmate Christopher continued to curse at me while violently kicking the door. Inmate Christopher made statements that he was going to spit on me. I looked Inmate Christopher up on Offendertrak and he is shown to have Hep C.

Inmate Christopher continued to call me a "piece of shit" and he also stated that everytime he saw me he would call me a "fucking gook." Inmate Christopher also stated that he was going to sue me for physically placing my hands on him. Inmate Christopher also demanded that he be given access to a telephone to call his attorney.

Per Classification, Inmate Christopher has been rehoused in P-2 . . . .

In support of his actions, defendant has submitted the opinion of law enforcement expert David A. Rose. Mr. Rose opines in part that plaintiff's "allegations are unfounded and he is not accurately describing the incident in question," and "Vang's actions were reasonable, consistent with training and in compliance with departmental policies." (Dkt. No. 56-2at 7, 8.)

V. Allegedly Resulting Injuries and Medical Evidence

    A. Plaintiff's Allegations and Evidence

        Plaintiff alleges that, as a result of his April 2, 2008 interaction with defendant Vang, plaintiff suffered physical injuries to his back causing chronic back pain, as well as psychological injuries of emotional distress, nightmares and "paranoid psychosis." (Dkt. No. 1 at 4.)

////

////

////

////

Plaintiff has submitted the following medical evidence:[2]

Plaintiff's Exhibit 1:  April 22, 2009 Interdisciplinary Progress Notes from the California Department of Corrections and Rehabilitation ("CDCR").[3]  (Bates No. DCRR-00769.)

Plaintiff's Exhibit 2:  June 17, 2004 Physician's Progress Notes. (Bates No. DCRR-01081.)

Plaintiff's Exhibit 4:  April 6 and April 9, 2008 Progress Notes from the California Forensic Medical Group ("CFMG").

Plaintiff's Exhibit 7:  April 4 and April 7, 2008 Sick Slips and April 4, 2008 Progress Notes (CFMG).

Plaintiff's Exhibit 9:  April 12-13, 18-20 2008 Progress Notes (CFMG).

Plaintiff's Exhibit 11:  April 15 and May 25, 2008 Sick Slips (CFMG).

Plaintiff's Exhibit 12:  Plaintiff's mental health evaluations and progress notes.  (Bates Nos. DCRR-00415, 00416, 00420, 00644, 00645.)

Plaintiff's Exhibit 13:  November 5, 2008 Health Care Services Request Form and December 26, 2008 Interdisciplinary Progress Notes.  (Bates Nos. DCRR-00412, 00772.)

Plaintiff's Exhibit 14:  April 16, 2009 Health Care Services Request form.  (Bates Nos. DCRR-00385.)

Plaintiff's Exhibit 15:  June 29, 2009 Interdisciplinary Progress Note.  (Bates No. DCRR-00759.)

Plaintiff's Exhibit 16:  February 1, 2010 Health Care Services Request Form and February 10, 2010 Progress Note.  (Bates Nos. DCRR-00357 and 356.)

Plaintiff's Exhibit 17:  October 11, 2010, November 7, 2010, and December 26, 2010 Health Care Services Request Forms.  (Bates Nos. DCRR-00285, 00297-298.)

Plaintiff's Exhibit 18:  June 21, 2010 and November 9, 2010

---

[2]  For the reasons discussed below, the court does not, at this time, set forth the content of these medical reports and notes.

[3]  Unless otherwise noted, the remaining cited medical records were prepared by CDCR medical providers.

1    Physician's Progress Notes.  (Bates Nos. DCRR-00686, 00678.)

2    <u>Plaintiff's Exhibit 19</u>:  Dr. Davis Smith's Expert Report and
     curriculum vitae.
3

4    <u>Plaintiff's Exhibit 20</u>: July 13, 2011 Southeast X-Ray, Inc.
     Radiology Interpretation of Dr. Michael Yuz.  (Bates No. DCRR-
     02389.)
5

6    <u>Plaintiff's Exhibit 21</u>: July 22, 2011 report of Brain and Spine
     Center by Dr. Sherwin Hua.  (Bates No. DCRR-02385.)

7    In addition, plaintiff has submitted the following expert medical opinion:

8    <u>February 6, 2012 Report</u> of Orthopedic Expert Dr. David G. Smith,
     that plaintiff sustained "[a]pparent thoracic and lumbar injuries
9    secondary to incident as described above on April 2, 2008."  (Dkt.
     No. 55-5 at 14.)
10

11   B.  <u>Defendant's Response and Evidence</u>

12       Defendant asserts that plaintiff has failed to demonstrate "a serious or permanent

13   injury" resulting from the challenged incident and, on this basis alone, moves for summary

14   judgment.  (Dkt. No. 54-1 at 5-14.)

15       In addition to submitting plaintiff's CDCR and CFMG records, defendant has

16   submitted the following medical evidence:

17   <u>July 29, 2011 Declaration</u> of CFMG Physician's Assistant Donald
     Durett, stating that he, "at no time," found that plaintiff "suffered
18   any injury as a result of an alleged altercation between himself and
     any of the correctional officers at the Butte County Jail."  (Dkt. No.
19   54-3 at 1.)

20   <u>March 21, 2011 Report</u>, and <u>March 20, 2012 Declaration</u> of
     Orthopedic Expert Dr. Joseph McCoy, opining that "there is no
21   evidence of any specific injury to Plaintiff related to the April 2,
     2008 incident."  (Dkt. No. 54-6 at 2.)
22

23   <u>May 5, 2011 Report</u>, and <u>March 18, 2012 Declaration</u> of
     Psychiatric Expert Dr. James Margolis, opining that "[p]laintiff's
     mental deficiencies are unrelated to the April 2, 2008 incident,"
24   and "there is no evidence of PRSD in Plaintiff as a result of the
     April 2, 2008 incident."  (Dkt. No. 54-5 at 2.)
25

26   ////

VI.  <u>Discussion</u>

Acknowledging that "[t]he facts regarding the incident are in dispute" (Dkt. No. 54-1 at 2 n.1), defendant's motion is premised only on the asserted "lack of a serious or permanent injury" to plaintiff.  Noting the four elements underlying the court's assessment of an excessive force claim, <u>White</u>, <u>supra</u>, 901 F.2d at 1507, defendant asserts that "plaintiff's due process claim fails at prong 3 ['the extent of the injury inflicted']."  (Dkt. No. 54-1 at 8.)

This narrow approach to an excessive force claim has been rejected by the United States Supreme Court.  This court quotes at length the pertinent holding of the Court in <u>Wilkins v. Gaddy</u>, 559 U.S. 34, 130 S. Ct. 1175, 1178-79 (2010):

> [In <u>Hudson v. McMillian</u>, <u>supra</u>, 503 U.S. 1], this Court rejected the notion that "significant injury" is a threshold requirement for stating an excessive force claim.  The "core judicial inquiry," we held, was not whether a certain quantum of injury was sustained, but rather "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  503 U.S. at 7; <u>see also</u> <u>Whitley v. Albers</u>, 475 U.S. 312, 319-321 (1986).  "When prison officials maliciously and sadistically use force to cause harm," the Court recognized, "contemporary standards of decency always are violated . . . whether or not significant injury is evident.  Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury."  <u>Hudson</u>, 503 U.S. at 9; <u>see also</u> <u>id.</u> at 13-14 (Blackmun, J., concurring in judgment) ("The Court today appropriately puts to rest a seriously misguided view that pain inflicted by an excessive use of force is actionable under the Eighth Amendment only when coupled with 'significant injury,' e.g., injury that requires medical attention or leaves permanent marks").
>
> This is not to say that the "absence of serious injury" is irrelevant to the Eighth Amendment inquiry.  <u>Id.</u> at 7.  "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation."  <u>Ibid.</u> (quoting <u>Whitley</u>, 475 U.S. at 321).  The extent of injury may also provide some indication of the amount of force applied.  As we stated in <u>Hudson</u>, not "every malevolent touch by a prison guard gives rise to a federal cause of action."  503 U.S. at 9.  "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind."  <u>Ibid.</u> (some internal quotation marks omitted). An

inmate who complains of a "push or shove" that causes no
discernible injury almost certainly fails to state a valid excessive
force claim.  Ibid. (quoting Johnson v. Glick, 481 F.2d 1028, 1033
(2d Cir. 1973)).

Injury and force, however, are only imperfectly correlated, and it is
the latter that ultimately counts.  An inmate who is gratuitously
beaten by guards does not lose his ability to pursue an excessive
force claim merely because he has the good fortune to escape
without serious injury.  Accordingly, the Court concluded in
Hudson that the supposedly "minor" nature of the injuries
"provide[d] no basis for dismissal of [Hudson's] § 1983 claim"
because "the blows directed at Hudson, which caused bruises,
swelling, loosened teeth, and a cracked dental plate, are not de
minimis for Eighth Amendment purposes."  503 U.S. at 10.

Accord, Monclova-Chavez v. McEachern, 2011 WL 39118, *4  (E.D. Cal. 2011) ("the relevant

inquiry is not whether Plaintiff's injuries are de minimis, but whether the use of force was de

minimis") (citing Wilkins, 130 S. Ct. at 1178); McClain v. Gonzales, 2011 WL 3664608, *7 n.2

(E.D. Cal. 2011) ("the malicious and sadistic use of force by prison officials always violates

contemporary standards of decency, even where there is no visible physical injury resulting"

(citing Hudson, 503 U.S. at 9; and Oliver v. Keller, 289 F.3d 623, 628 (9th Cir. 2002)).

Significantly, Wilkins was decided after White v. Roper, 901 F.2d 1501, on which

defendant relies.  In White, the Ninth Circuit Court of Appeals found that plaintiff had "not made

a showing sufficient to establish that the use of force against him was 'excessive' or 'brutal,'"

because, although "[t]he amount and type of force used is disputed," plaintiff failed to

demonstrate "that he required or even that he requested medical treatment for the cut wrist and

the bruises he allegedly suffered [and] does not allege that he lost consciousness at any time, or

that he suffered any permanent injury."  White, 901 F.2d at 1507.  While this court has not

located another case expressly rejecting White's narrow reliance on the extent of the plaintiff's

injuries to determine whether the challenged force was excessive, the undersigned finds that this

approach has been abrogated by Wilkins.

Moreover, consideration of defendant's argument as presented, based only on an

analysis of the medical evidence, demonstrates the existence of material factual disputes

1    precluding summary judgment.  Defendant asserts that the opinions of plaintiff's orthopedic

2    expert, Dr. Smith, that plaintiff's disc protrusions "could be as a result of the incident occurring

3    on April 2, 2008," and "[i]t is certainly possible that Mr. Christopher sustained an injury to his

4    lumbar spine on April 2, 2008,"  (Dkt. No. 54-1 at 11) (quoting Smith Report, Dkt. No. 55-5 at

5    14), are impermissibly speculative, and thus fail to meet the requirement that a party present

6    "substantial" evidence in opposition to a motion for summary judgment, citing Anderson v.

7    Liberty Lobby, Inc., supra, 477 U.S. at 251.  (Dft. Motion, Dkt. No. 54-1 at 11-12.)  Similarly,

8    defendant asserts that plaintiff has failed to submit expert medical opinion in support of his

9    alleged psychological injuries, and that the only evidence in support of plaintiff's subjective

10   assertions of post-traumatic stress disorder (" PTSD") are "three chart notes assessing Plaintiff

11   with 'possible' or 'apparent' PTSD" (citing Pltf. Exh. 12 at 1, 4, and 5 (Dkt. No. 55-4 at 4, 7, 8)).

12   (Dft. Reply, Dkt. No. 56 at 3.)

13          The court rejects defendant's argument that plaintiff's evidence demonstrates a

14   "complete failure of proof," Celotex, 477 U.S. at 323, concerning his alleged injuries.  Not only

15   has plaintiff submitted some medical evidence in support of his alleged injuries, but the evidence

16   on summary judgment  must be viewed in the light most favorable to plaintiff.  Matsushita, 475

17   U.S. at 587.  Thus, the undersigned finds that the parties' respective allegations are sufficiently

18   supported to demonstrate a material factual dispute concerning the existence and extent of

19   plaintiff's injuries resulting from the April 2, 2008 incident.

20          More importantly, as previously emphasized, plaintiff's injuries are only one

21   factor in assessing an excessive force claim, with the amount of force being the principal factor.

22   Wilkins, 130 S. Ct. 1175, 1178-79.  Because the parties concur that the facts underlying this

23   factor remain disputed, the court is unable to fully assess the merits plaintiff's excessive force

24   claim on defendant's motion for summary judgment.

25   ////

26   ////

VII. <u>Conclusion</u>

        Accordingly, for the foregoing reasons, IT IS HEREBY ORDERED that defendant's motion for summary judgment (Dkt. No. 54), is denied.

        By separate order, the court will direct the filing of a joint status report with proposed dates for trial and a pretrial conference; at the request of counsel for both parties, a settlement conference will first be scheduled.

        SO ORDERED.

DATED:  March 6, 2013


_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

/christo3584.msj